UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CAROL G. KERTZ,

Plaintiff,

vs. Case No. 2:12-cv-22-FtM-29SPC

UNITED STATES OF AMERICA,

Defendant.

---

**OPINION AND ORDER**

This matter is before the Court on Carol G. Kertz's Amended Complaint (Doc. #33) against the United States of America (defendant or United States) asserting a claim for negligence pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671-2680. Plaintiff asserts defendant breached its duty to maintain the parking lot at the Naples, Florida Post Office in a reasonably safe condition. (Doc. #51, p. 2, ¶3A.)[1] The Court conducted a bench trial on May 21 and 22, 2013.

**I.**

The Court finds the following facts have been established by at least a preponderance of the evidence:

---

[1]The Complaint also included a failure to warn claim as part of the count. This portion of the claim has not been pursued in the Amended Pretrial Statement (Doc. #51, p. 2, ¶3), and is thereby abandoned by plaintiff.

On Wednesday, December 1, 2010, plaintiff Carol G. Kertz (Kertz or plaintiff) was sent by her employer to the United States Post Office located at 1200 Goodlette Road in Naples, Florida to mail a package. This facility is considered the main branch of the post office in Naples, and is owned and operated by the United States Postal Service (Postal Service). Kertz arrived at about 1:10 p.m, and parked her vehicle in the parking lot at the front of the post office building, in the second parking space to the left of a pedestrian ramp walkway leading to the building entrance. Joint Exhibit 6. A sidewalk which appears to be 3-4 inches higher than the parking lot borders the front of this parking space and others in the immediate vicinity. This sidewalk runs parallel to the front of the post office building and leads to the building entrance. The front of the parking space has a five-inch tall concrete "wheel stop"[2] painted bright yellow, as do all the other parking spaces in the vicinity. The wheel stop is anchored to the asphalt parking lot with rebar[3] which have been driven through holes in the wheel stop into the asphalt and underlying lime rock foundation. The rebar holding the wheel stops in place are intended to be flush with the top of the wheel stop.

[2]What the Court refers to as a "wheel stop" is variously referred to in the record as a "wheel block", "parking block", or the like.

[3]What the Court refers to as "rebar" is variously referred to in the record as an "anchor pin", "anchor bar", or the like.

Kertz exited her vehicle, noticing and stepping over the yellow wheel stop. She walked into the post office building and dropped off her package without incident. Kertz exited the building and walked towards her vehicle along the sidewalk in front of the building. Kertz stepped off the sidewalk near the driver's side of her vehicle, reaching for keys in her purse as she did so. As she was in the process of walking and removing keys from her purse, Kertz's left foot caught on something as she stepped over the wheel stop, and she tripped and fell, landing hard on the asphalt. At the time of the fall, plaintiff did not see what had caused her to fall.

The only eyewitness to the fall who testified (by deposition) was Matt Sutter (Sutter). Sutter testified that while sitting in his vehicle at the post office he observed a woman coming out of the post office. The woman stepped off the sidewalk into the parking lot while she was looking for something in her purse. Sutter saw the woman make her first step successfully, and as she brought her second foot into the parking lot she spun around, lost momentum, tripped, and fell. Based upon her change in momentum, Sutter assumed she had tripped over the wheel stop, and later observed that there was a piece of rebar sticking out of it. When he asked the woman what happened, she said that her heel got stuck on the rebar and she tripped. Sutter had not personally seen her

feet or what she tripped on. Joint Exhibit 33, pp. 6-7, 12-13, 14-15.

Plaintiff was transported by ambulance to the Naples Community Hospital, where she was found to have suffered a left femoral neck fracture. Plaintiff's left shoe was not transported with her, and her husband was unable to find the shoe when he went to the post office to look for it. The shoe was never located.

An inspection of the area immediately after the fall revealed that the wheel stop had a piece of rebar sticking up between 7/8 to 1 inch above its top. An Accident Investigation Worksheet dated the day of the accident, Joint Exhibit 15, identifies Deborah A. Howard (Howard) as the "USPS Investigator" id., line 25, and is signed by Howard. The investigative worksheet states that Kertz was "[w]alking to car came off the sidewalk and stepped over concrete parking stop was looking for keys in her purse and tripped over rebar sticking up 1 inch" [sic]. Id., line 37. A post office Accident Report, which also states it was prepared by Howard, describes the accident as "[c]ustomer tripped on rebar protruding from concret[e] sto[p]". Joint Exhibit 16, line 8. The Accident Report further stated Kertz "[w]as walking to car came off the sidewalk and stepped over concrete parking stop was looking for keys in her purse and tripped over rebar sticking up 1 inch [sic]." Id. at line 31. The Accident Report continues that her "shoe caught on rebar and customer tripped and fell to the ground". Id.

at line 32. The Accident Report has a pre-printed question stating "What object or substance directly harmed the employee?", and the stated answer was "rebar". Id. at line 34. Howard directed custodian Edward McCall (McCall) to obtain a camera and take photographs of the scene of the accident, which he did. Joint Exhibits, 6-13. Afterwards, McCall used a hammer to pound the rebar back below the top level of the wheel stop.

On December 2, 2010, Kertz underwent a total hip arthroplasty. Kertz was discharged from the hospital on December 4, 2010. On February 10, 2011, Kertz was medically cleared to return to work for four hours a day, five days a week. On March 14, 2011, she was medically cleared to return to work without restrictions. Plaintiff is seeking past economic damages in the amount of $38,508.90 for past medical care and lost wages. Plaintiff is also seeking non-economic damages in the amount of $150,000.[4]

Additional facts will be discussed below as needed to resolve specific issues.

**II.**

The Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671, *et seq.*, gives the district courts exclusive jurisdiction over civil actions against the United States for personal injuries "caused by the

[4]The Court notes that the Amended Complaint states that plaintiff is seeking a total of $500,000.00 in recovery. However, during trial, plaintiff's counsel requested only $150,000.00 in non-economic damages and $38,508.90 for past medical care and lost wages.

negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimaint in accordance of the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The FTCA applies to the Postal Service, 39 U.S.C. § 409(c), and a tort claim against the Postal Service must be cognizable under the FTCA to proceed. McCollum v. Bolger, 794 F.2d 602, 608 (11th Cir. 1986). The parties agree, and the law is clear, that Kertz's negligence claim under the FTCA is governed by Florida law. (Doc. #51, p. 11, ¶G.) See, e.g. Stevens v. Battelle Memorial Institute, 488 F.3d 896, 899 n.3 (11th Cir. 2007) ("[l]iability in an FTCA action is determined in accordance with the law of the place where the government's act or omission occurred"); Miles v. Naval Aviation Museum Foundation, Inc., 289 F.3d 715, 722 (11th Cir. 2002) ("The FTCA creates liability for the United States only if the act at issue is a tort in the state where the conduct occurred.").

The elements of negligence under Florida law are well settled. "The elements of negligence are: (1) a duty to the plaintiff; (2) the defendant's breach of that duty; (3) injury to the plaintiff arising from the defendant's breach; and (4) damage caused by the injury to the plaintiff as a result of the defendant's breach of duty." Delgado v. Laundromax, Inc., 65 So. 3d 1087, 1089 (Fla. 3rd

DCA 2011). In relevant part, the parties agree that under Florida law: a landowner is not an insurer of the safety of its invitees; negligence may not be inferred from the mere happening of an accident alone; and that a property owner is entitled to assume that an invitee will perceive dangers which would be obvious to an invitee upon the ordinary use of his or her own senses. (Doc. #51, p. 12, ¶¶ J, L.)

The parties identified the disputed issues of fact as: (1) Whether Plaintiff can prove that the exposed rebar was the cause of her accident; (2) Whether Plaintiff can demonstrate that the USPS had knowledge of the exposed rebar; (3) Whether Plaintiff can demonstrate that the USPS failed to use ordinary and reasonable care to keep its premises reasonably safe for invitees; (4) Whether Plaintiff's injuries were caused by her own actions or omissions, including her failure to exercise ordinary, reasonable care for her safety, and her inattentiveness to the conditions of her immediate surroundings; (5) Whether the exposed rebar was open and obvious; (6) If damages are awarded, whether a $1,000 "bonus" Plaintiff may have received from her employer should be included as part of Plaintiff's economic damages; and (7) The amount of Plaintiff's non-economic damages, if any. (Doc. #51, pp. 12-13.)

**III.**

**A. Duty to Plaintiff**

The legal duties of a property owner are clear under Florida law. "Generally, a property owner owes two duties to an invitee: (1) the duty to use reasonable care in maintaining the property in a reasonably safe condition; and (2) the duty to warn of latent or concealed dangers which are or should be known to the owner and which are unknown to the invitee and cannot be discovered through the exercise of due care. The open and obvious nature of a hazard may discharge a landowner's duty to warn, but it does not discharge the landowner's duty to maintain the property in a reasonably safe condition." Dampier v. Morgan Tire & Auto, LLC, 82 So. 3d 204, 206 (Fla. 5th DCA 2012)(citations omitted). See Lomack v. Mowrey, 14 So. 3d 1090, 1092 (Fla. 1st DCA 2009)(citations omitted). "A plaintiff's awareness of a dangerous condition does not negate a defendant's potential liability for negligence in allowing the dangerous condition to exist; it may be relevant, however, to a determination of comparative negligence." Burton v. MDC PGA Plaza Corp., 78 So. 3d 732, 734 (Fla. 4th DCA 2012).

It is undisputed that plaintiff was an invitee properly on the premises of the Naples post office, including its front parking lot. Thus, the United States owed plaintiff a duty to reasonably maintain its premises, including the front parking lot.

**B. Breach of Duty**

While there is no dispute as to the existence of the legal duty towards plaintiff, the parties contest whether that duty was breached. The parties agree that there is no evidence that the Postal Service had actual notice of the protruding rebar at the time of Kertz's fall. (Doc. #42, p. 9, ¶N.) From there, the positions vary.

Postmaster Richard Barber (Barber), a Postal Service employee for over 39 years, testified that he did not witness the Kertz accident, and never saw the rebar sticking out of the wheel stop.[5] As Postmaster, however, Barber personally oversees the maintenance done at this post office. Barber testified there was a daily inspection procedure in effect which involved McCall checking the front parking lot when he arrived at work and Barber checking the parking lot when he arrived later. These inspections were noted in a monthly log sheet. Joint Exhibits 2, 3. Quarterly inspections are also performed, the most recent being the week before plaintiff's accident. Joint Exhibit 5. None of these inspections noted any issue with protruding rebar in the front parking lot.

Barber further testified that on the morning of the accident he had inspected the parking lot at 8:15 a.m., and did not see any rebar sticking out from the top of the wheel stop. Barber

[5]It had been repaired by the time he returned to the post office and viewed the scene of the accident.

testified that although he has never seen rebar sticking out of a wheel stop in the post office parking lot, it would have "jump[ed] right out at me" if it had been in that condition at the time of his inspection, and "could not get past me." Barber further testified that if the rebar had been exposed as depicted in Joint Exhibit 7, he would have seen it during his inspection. Barber declined to characterize such protruding rebar as a tripping hazard or dangerous condition, but stated he just liked to keep his post office without such a situation. Barber testified he was unaware of any injuries resulting from exposed rebar in the wheel stops in his 26 years[6] at that post office.

McCall is a 30 year employee of the Postal Service and is employed as a custodian at the Naples post office. He testified that on December 1, 2010, he inspected the parking lot at about 6 a.m. This inspection included looking at each and every wheel stop. McCall testified he could say "absolutely" that the rebar was not sticking out of the wheel stop at issue when he made his December 1 morning inspection. If he had seen such exposed rebar, he would have hammered it down.

Unlike Postmaster Barber, McCall testified he has encountered rebar sticking out of the post office parking lot wheel stops. He estimated this occurred four to six times per year. Each time he

[6]Barber testified that he has been a Postal Service employee for over 39 years, 26 of which he worked in the Naples Post Office.

would get a hammer and pound the rebar down in place. McCall testified there was nothing he could do to keep this from happening again. McCall would not make a notation on his inspection log of the rebar or the remedial action he took.

Lyndal Colyer (Colyer), a 20 year Postal Service employee who was the post office's building maintenance custodian, estimated he has seen exposed rebar in the post office parking lot wheel stops once or twice a year during his eight year tenure at that post office. Colyer would hammer the exposed rebar down, without reporting or logging the event. Colyer inspected the post office parking lot on December 1, 2010, and saw no exposed rebar.

While three Postal Service employees thus testified there was no exposed rebar as of about 8:15 a.m. on December 1, the evidence establishes beyond any doubt that by 1:00 p.m. there was approximately one inch of rebar exposed through the top of the wheel stop. The government postulates that there was an intervening event which caused this sudden rebar exposure. Both Barber and McCall testified that they believed the front end of a low-slung vehicle had gone over the wheel stop, and in backing up had caused the concrete wheel stop to move and the rebar to pop up and not drop all the way down. McCall testified he has seen such events in the past, although Barber received no reports of vehicle damage that day.

To bolster this theory, the government called Barry Gaines (Gaines), a civil structural engineer. Gaines performed no testing to reach his opinions, but simply viewed the photographs and applied generally accepted engineering principles to arrive at a scenario which could explain the sudden appearance of the exposed rebar. Gaines expressed three relevant opinions based on his review of photographs. First, Gaines deduced from the smoothness and lack of surface rust that the rebar had been exposed for a "short time", Defendant's Exhibit 2, or a "very short period of time", which he defined as a day or two (trial testimony). Second, Gaines deduced from the paint on one side of the rebar that the exposed rebar could have been caused by the wheel of a heavy vehicle such as a Humvee or Suburban hitting and going over the wheel stop, then pulling the wheel stop forward as the vehicle backed up. Gaines testified variously that this one vehicle explanation was physically "possible," (Defendant's Exhibit 2), or was a likely scenario (trial testimony), or more likely to have happened than not (trial testimony). Unlike Barber's and McCall's theory, Gaines' theory did not involve simply the front end of a vehicle striking the wheel stop. Third, Gaines opined that it was "highly unlikely" the condition depicted in the photographs was caused by the gradual rising of the anchoring-pin over a long period of time, as plaintiff's expert reported. (Defendant's Exhibit 2.)

To counter this explanation of the sudden appearance of a previously concealed rebar, plaintiff called Dr. Zdenek Hejzlar (Dr. Hejzlar), Ph.D., CSP. Dr. Hejzler identified himself as a scientist, not an engineer, and his relevant opinion was that repeated rocking of the wheel stop over a likely period of several days or weeks caused the upward movement of the rebar. This opinion was not arrived at by any testing involving vehicles.

The Court did not find either expert particularly helpful. It is undisputed that the rebar was exposed by about an inch above the top of the wheel stop when plaintiff left the post office building. The Court is satisfied that it is possible for a heavy vehicle to have created that situation in a single event, as described by Gaines. The Court is not satisfied, however, that there is sufficient credible evidence to establish this is what actually happened in this case. The Court rejects the opinion of Gaines that simply looking at the photographs and applying civil engineering principles results in a reasonable conclusion that a heavy vehicle actually caused the rebar protrusion in this case. The best that can be said is that it is possible. But there is no convincing physical evidence visible in the photographs which would support a reasonable view that this actually occurred here, and the Court found Gaines's explanation unconvincing. The testing by plaintiff's expert is similarly unpersuasive as to the actual cause for the rebar protrusion in this case. It is indeed possible for

the rebar to have become exposed in the manner described by Dr. Hejzlar, but his testing provides faint support for that theory.

What was established is that the Postal Service maintenance staff was aware that rebar periodically would protrude from the top of the wheel stops, for whatever reason, and when that occurred the staff would pound them flush. While no Postal Service employee admitted this was for safety reasons, the Court found that portion of their testimony not credible. It is clear to the Court, and the Court finds that it was clear to all three Postal Service employees, that rebar sticking an inch above the top of a wheel stop posed a significant and unreasonably dangerous condition and safety hazard to the patrons of the post office. The evidence which the Court found credible convinces the Court that the rebar was not flush or near-flush with the top of the wheel stop on the morning of December 1. Rather, the Court is convinced that the rebar was protruding by approximately one inch, and that this protrusion was simply overlooked by the Postal Service employees in their various inspections. In failing to remedy the exposed rebar, the Postal Service breached its duty to use reasonable care in maintaining the parking lot in a reasonably safe condition.

**C. Causation**

The Postal Service argues that plaintiff did not trip over the protruding rebar, but rather tripped over the wheel stop itself as a result of her own inattention and negligence. The Court finds

that the credible evidence establishes that plaintiff did not trip over the wheel stop itself, but over the protruding rebar, and that this was not the result of any inattention or negligence on her part. All the investigative reports prepared by the Postal Service attribute the cause of the fall to the protruding rebar, as summarized above. The witness who observed the fall also attributed it to the rebar, although he did not see the actual cause of the fall. Plaintiff testified she saw the yellow wheel stop (but not the rebar), stepped over the wheel stop, but tripped on something else.

The Court is also not persuaded that plaintiff is responsible for her fall. The credible evidence convinces the Court that Kertz's injuries were not caused by her own actions or omissions, a failure to exercise ordinary, reasonable care for her safety, or an inattentiveness to the conditions of her immediate surroundings. Although plaintiff has always stated she was in the process of getting her keys from her purse, she testified that she was aware of the parking block while stepping over it. The Court found her testimony to be credible, and is not convinced by the government's evidence and arguments to the contrary.

Furthermore, the Court finds that the evidence demonstrates that the rebar condition of the wheel stop was not so "open and obvious" that a reasonable post office patron should have noticed the exposed rebar and taken active steps to avoid it. Kertz

testified that she was aware of the parking block while stepping over it, and did not see the exposed rebar. None of the employees who performed the parking lot inspections noticed the exposed rebar. The Court finds that defendant is 100% responsible for plaintiff's fall due to its failure to maintain the premises in a reasonably safe condition.

**D. Damages**

In their amended pre-trial statement, the parties stipulated that with respect to economic damages, plaintiff's workman's compensation carrier has paid $33,394.64 in medical and indemnity benefits, that plaintiff has not personally paid for any medical expenses for which she has not been reimbursed, and that plaintiff has not been indemnified for $4,114.26 in lost wages as a result of her injuries. (Doc. #51, ¶¶ T-V.) Accordingly, there is no dispute that plaintiff incurred $37,508.90 in economic damages.[7]

The pre-trial statement indicates that the parties dispute whether plaintiff is also entitled to $1,000.00 in economic damages for a holiday bonus that Kertz did not receive. At trial, plaintiff testified that typically each year around the holidays she was awarded a Christmas or annual bonus. For the two years

---

[7]At oral argument, the United States asserted that while there is no dispute as to this amount of economic damages, the reward should be reduced in accordance with the plaintiff's comparative negligence. Because the Court has found that plaintiff was not at fault for her injuries, by any percentage, plaintiff is entitled to the entirety of her economic damages.

preceding the accident her bonus was $1,000.00 per year. In 2010, she was not awarded a bonus for reasons which were not disclosed by her employer. Plaintiff conceded that it was up to her employer's discretion to award a bonus.

During oral argument, neither party made any argument with respect to whether or not plaintiff is entitled to recover her 2010 $1,000.00 bonus. No evidence showed there were any changes in Kertz's employment, other than her injury-related absences, which would have been expected to cause her employer to decline a bonus in 2010. The Court finds that the evidence creates a reasonable inference that but for the absences caused by the accident, Kertz would have received a $1,000.00 bonus in 2010. Accordingly, the Court awards plaintiff $38,508.90 in economic damages.[8]

With respect to non-economic damages, at oral argument plaintiff's counsel indicated that plaintiff seeks $150,000.00 for pain and suffering and mental distress. Plaintiff's counsel relied primarily on plaintiff's orthopedic surgeon's summary of plaintiff's injuries to support these damages. The government points to the letter's statement that only 4% of the plaintiff's overall body has any remaining impairment.

With respect to pain and suffering, Dr. Bigg's letter, which summarizes plaintiff's treatment, notes that Kertz suffered a

---

[8]Plaintiff does not seek any future economic damages. (Doc. #51, ¶7.)

femoral neck fracture and underwent a total hip arthroplasty for the fracture. She has reached her maximal medical improvement and has a 10% impairment of her lower extremity as a result of the surgery. This represents a 4% total body impairment. See Joint Exhibit 22. During trial, plaintiff testified that the fall resulted in excruciating pain. Plaintiff was hospitalized for five days following her surgery and she has permanent plates and screws implanted in her body. Plaintiff also underwent almost two (2) months of physical therapy. Plaintiff testified that it took her about six to seven months before she was able to get back to her routine of walking a couple of miles per week, and she had to walk with a cane.

Under the facts of this case, the Court finds that an award for pain and suffering, as well as general emotional distress is warranted. The Court finds that an award of $100,000.00 is appropriate under the circumstances set forth in the evidence.

Accordingly, it is now

**ORDERED:**

1. The Court finds that the defendant owed plaintiff a duty to reasonably maintain its premises, but breached this duty, which caused injuries to the plaintiff. The Court further finds that plaintiff bears no responsibility for her injuries.

2. The Clerk shall enter judgment in favor of plaintiff and against defendant, awarding plaintiff $33,394.64 in medical and

indemnity benefits, $5,114.26 in lost wages and bonus, and $100,000.00 for pain and suffering.

3. The Courtroom Deputy is directed to enter judgment as set forth above.

4. The Clerk is directed to terminate all deadlines and motions, and to close the file.

**DONE AND ORDERED** at Fort Myers, Florida, this 21st day of June, 2013.

**JOHN E. STEELE**
**United States District Judge**

Copies:

Counsel of record